UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRISTINA LEA GALKOWSKI,<br><br>                          Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,<br><br>                          Defendant. | Case No.:  16cv928-AJB-MDD<br><br>**REPORT AND<br>RECOMMENDATION ON CROSS<br>MOTIONS FOR SUMMARY<br>JUDGMENT**<br><br>**[ECF Nos. 15, 17]** |

    Plaintiff Kristina Lea Galkowski ("Plaintiff") filed this action pursuant
to 42 U.S.C. § 405(g) for judicial review of the decision of the Commissioner of
the Social Security Administration ("Commissioner") denying Plaintiff's
application for disability and disability insurance benefits under Title II for
supplemental security income payments under Title XVI of the Social
Security Act.  Plaintiff moves the Court for summary judgment reversing the
Commissioner and ordering an award of benefits, or, in the alternative, to
remand the case for further administrative proceedings.  (ECF No. 15).
Defendant moved for summary judgment affirming the denial of benefits.
(ECF No. 17).

For the reasons expressed herein, the Court recommends that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

## I. <u>BACKGROUND</u>

Plaintiff alleges that she became disabled on February 24, 2011, due to degenerative disc disease, fibromyalgia, depression, fatigue, back pain, and obesity. (A.R. 23).[1] Plaintiff's date of birth, September 9, 1980, categorizes her as a younger person on the alleged disability onset date. 20 C.F.R. §§ 404.1563, 416.963; (A.R. 35).

### A. <u>Procedural History</u>

On July 18, 2012, Plaintiff filed an application for social security disability insurance benefits and supplemental security income. (A.R. 20). The claims were initially denied on October 31, 2012, and denied upon reconsideration on March 25, 2013. (*Id.*). On August 4, 2014, Plaintiff appeared at a hearing in San Diego, California before Administrative Law Judge ("ALJ") Nancy M. Stewart. (*Id.*). Plaintiff, impartial medical expert Arthur Lorber, M.D. and impartial Vocational Expert ("VE") Robin L. Generaux testified. (*Id.*).

On October 22, 2014, the ALJ issued a written decision finding Plaintiff not disabled. (A.R. 21, 37). Plaintiff appealed, and the Appeals Council declined to review the ALJ's decision. (A.R. 1). Consequently, the ALJ's decision became the final decision of the Commissioner. (*Id.*).

On April 18, 2016, Plaintiff filed a Complaint with this Court seeking judicial review of the Commissioner's decision. (ECF No. 1). On July 5, 2016, Defendant answered and lodged the administrative record with the Court.

---

[1] "A.R." refers to the Administrative Record filed on May 15, 2016, and is located at ECF No. 9.

(ECF Nos. 9, 10). On September 1, 2016, Plaintiff moved for summary judgment. (ECF No. 15). On November 4, 2016, the Commissioner cross-moved for summary judgment and responded in opposition to Plaintiff's motion. (ECF Nos. 17, 18). Lastly, on November 18, 2016, Plaintiff replied to the Commissioner's response. (ECF No. 18).

## II. <u>DISCUSSION</u>

### A. <u>Legal Standard</u>

The supplemental security income program provides benefits to disabled persons without substantial resources and little income. 42 U.S.C. § 1383. To qualify, a claimant must establish an inability to engage in "substantial gainful activity" because of a "medically determinable physical or mental impairment" that "has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1383(a)(3)(A). The disabling impairment must be so severe that, considering age, education, and work experience, the claimant cannot engage in any kind of substantial gainful work that exists in the national economy. 42 U.S.C. § 1383(a)(3)(B).

The Commissioner makes this assessment through a process of up to five-steps. First, the claimant must not be engaged in substantial, gainful activity. 20 C.F.R. § 416.920(b). Second, the claimant must have a "severe" impairment. 20 C.F.R. § 416.920(c). Third, the medical evidence of the claimant's impairment is compared to a list of impairments that are presumed severe enough to preclude work. 20 C.F.R. § 416.920(d). If the claimant's impairment meets or is equivalent to the requirements for one of the listed impairments, benefits are awarded. *Id.* If the claimant's impairment does not meet or is not equivalent to the requirements of a listed impairment, the analysis continues to a fourth and possibly fifth step and considers the claimant's residual functional capacity. At the fourth step, the

claimant's relevant work history is considered along with the claimant's residual functional capacity. If the claimant can perform the claimant's past relevant work, benefits are denied. 20 C.F.R. § 416.920(e). At the fifth step, if the claimant is found unable to perform the claimant's past relevant work, the issue is whether the claimant can perform any other work that exists in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. If the claimant cannot do other work that exists in the national economy, benefits are awarded. 20 C.F.R. § 416.920(f).

Section 1383(c)(3) of the Social Security Act, through Section 405(g) of the Act, allows unsuccessful applicants to seek judicial review of a final agency decision of the Commissioner. *See* 42 U.S.C. §§ 1383(c)(3), 405(g). The scope of judicial review is limited and the Commissioner's denial of benefits "will be disturbed only if it is not supported by substantial evidence or is based on legal error." *Brawner v. Secretary of Health & Human Services*, 839 F.2d 432, 433 (9th Cir. 1988) (quoting *Green v. Heckler*, 803 F.2d 528, 529 (9th Cir. 1986)).

Substantial evidence means "more than a mere scintilla" but less than a preponderance. *Sandqathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997). "[I]t is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Andrews v. Shalala* 53 F.3d 1035, 1039 (9th Cir. 1995)). The court must consider the record as a whole, weighing both the evidence that supports and detracts from the Commissioner's conclusions. *Desrosiers v. Secretary of Health & Human Services*, 846 F.2d 573, 576 (9th Cir. 1988). If the evidence supports more than one rational interpretation, the court must uphold the ALJ's decision. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). When the evidence is inconclusive,

"questions of credibility and resolution of conflicts in the testimony are functions solely of the Secretary." *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982).

The ALJ has a special duty in social security cases to fully and fairly develop the record in order to make an informed decision on a claimant's entitlement to disability benefits. *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991). Because disability hearings are not adversarial in nature, the ALJ must "inform himself [or herself] about the facts relevant to his decision," even if the claimant is represented by counsel. *Id.* (quoting *Heckler v. Campbell*, 461 U.S. 458, 471 n.1 (1983)).

Even if a reviewing court finds that substantial evidence supports the ALJ's conclusions, the court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching his or her decision. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978). Section 405(g) permits a court to enter a judgment affirming, modifying or reversing the Commissioner's decision. 42 U.S. C. § 405(g). The reviewing court may also remand the matter to the Social Security Administration for further proceedings. *Id.*

## B. <u>The ALJ's Decision</u>

The ALJ concluded Plaintiff was not disabled, as defined in the Social Security Act, from February 24, 2011, through the date of the ALJ's decision, October 22, 2014. (A.R. 20).

The ALJ found Plaintiff has the following severe impairments: degenerative disc disease, obesity, psychotic disorder and depressive disorder. (A.R. 23). The ALJ determined Plaintiff did not have an impairment or combination of impairments meeting or medically equivalent to the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1

(20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).  (A.R. 24).  Specifically, the ALJ found that "[n]o treating or examining physician has mentioned findings equivalent in severity to the criteria or any listed impairment, nor the does the evidence show medical findings that are the same or equivalent to those of any listed impairment." (*Id.*).  The ALJ considered listings 1.04, 12.03, and 12.04.  (*Id.*).

The ALJ also found that Plaintiff had mild restrictions in daily living activities, mild difficulties in social functioning, moderate difficulties with regard to concentration, persistence or pace and experienced no episodes of decompensation of extended duration.  (A.R. 24-25).

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to:

> [P]erform sedentary work . . . except [Plaintiff] can lift, carry, push or pull no more than 10 pounds, stand or walk no more than 2 hours, total, in an 8-hour workday, and for no more than 30 minutes at a time, sit for 6 hours in an 8-hour workday, with the ability to stand and stretch not more than 10 percent of the day; occasionally climb ramps and stairs, balance, stoop, kneel, and crouch, never climb ladders, ropes, or scaffolds, crawl, operate fast or dangerous machinery or drive commercial vehicles; never work in environments involving exposure to unprotected heights, or concentrated exposure to vibration; can perform no more than unskilled work, involving simple, repetitive tasks, and cannot perform fast paced work.

(A.R. 26).  After reviewing the record and Plaintiff's testimony, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms."  (A.R. 28).  The ALJ also found that the "record indicates that [Plaintiff's] severe mental impairments give rise to significant symptoms, which somewhat reduce her functional capacity, but also that these symptoms are not as severe as alleged."  (A.R. 32).

Relying on the record and testimony of VE Generaux, the ALJ found that Plaintiff is unable to perform any past relevant work. (A.R. 35). The ALJ stated that the record reflects that Plaintiff worked as a general office clerk, order clerk, security guard, receptionist and ticket seller. (*Id.*). VE Generaux testified that each of these positions required an exertional level that Plaintiff could not perform at her current functional capacity. (*Id.*).

The ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (A.R. 35). In determining this, the ALJ considered Plaintiff's RFC, that Plaintiff has at least a high school education, can communicate in English, is a "younger individual" and that transferable job skills are immaterial. (*Id.*). Based on this information, VE Generaux testified that Plaintiff can perform the occupations such as information clerk, mail clerk or charge account clerk. (A.R. 36). Accordingly, the ALJ found Plaintiff was not disabled from February 24, 2011 to the date of the ALJ's decision on October 22, 2014. (A.R. 36-37).

In determining that Plaintiff is not disabled, the ALJ noted the following to be of particular relevance:

### 1. Plaintiff's Physical Impairments

In considering Plaintiff's underlying medically determinable physical impairments, the ALJ specifically referred to: (a) Plaintiff's own reports and testimony; (b) the medical record from 2011 until 2014; (c) the lay opinions of Robert Powers, Jr., Plaintiff's boyfriend, and Teresa Michelle Browning, Plaintiff's longtime friend; (d) Medical Expert Arthur Lorber, M.D.'s testimony; and (e) State consultative examiner Frederick W. Close, M.D.'s opinion.

### a. Plaintiff's Reports and Testimony

Plaintiff's August 13, 2012, function report alleged that her

impairments limited her ability to lift, walk, squat, sit, bend, kneel, stand, reach, and climb stairs. (A.R. 26, 288). She explained that she could walk for a quarter of a mile at a time, but could not walk longer than fifteen minutes and had to rest for ten to fifteen minutes before resuming. (A.R. 26, 288, 290). Plaintiff reported she could lift less than ten pounds, could not squat, bend, kneel, reach above her head, stand for more than fifteen minutes, or sit for more than one hour and could climb two flights of stairs at most. (A.R. 26-27, 290). She indicated that she could do light cleaning (with frequent breaks), read and use the computer, could shop in stores about once a week, handle money, could finish what she started, could follow written instructions very well and get along with authority figures. (A.R. 34, 283-90). However, Plaintiff said that she required several breaks to complete chores. (A.R. 27, 288, 290). Plaintiff also indicated that stress increased her pain levels and her back and nerve pain roused her frequently from sleep. (A.R. 27, 284). Socially, Plaintiff stated that she attended one party every couple of months and spent time with friends and family once a week every other week. (A.R. 34, 288). Overall, Plaintiff reported that her impairments affected her ability to cook, do housework, leave the house, and negatively impacted her social life. (A.R. 27, 248-86, 288).

Plaintiff's initial disability report from July 31, 2012, reports that Plaintiff was taking Ativan, Flexeril, gabapentin, Norco, Prozac and trazodone. (A.R. 28, 257). Plaintiff reported taking Flexeril, gabapentin, Norco, Prozac, meloxicam and Robaxin in her May 3, 2013, hearing-level disability report. (A.R. 28, 314). At the hearing, Plaintiff testified that she was taking Norco, Mobic and gabapentin. (A.R. 28). Plaintiff said that gabapentin contributed to her fatigue, caused her to forget words and names, slur words, weave while walking, and caused short-term memory loss. (*Id.*).

16cv928-AJB-MDD

At the hearing, Plaintiff testified that her physical impairments have been treated for the most part with medication and that her doctors would consider surgery if the medication stopped working. (A.R. 27). She also stated that physical therapy did not completely alleviate all of her pain and doctors never recommended epidurals or use of a back-brace or cane. (*Id.*). While Plaintiff was urged to lose weight, she testified that she was not generally physically capable of losing weight. (*Id.*).

Plaintiff's hearing-level disability report from May 3, 2013, reports increased pain and fatigue. (A.R. 27, 308). Plaintiff reported involuntary muscle twitches, further disc degeneration in her cervical spine and deteriorated sleep patterns, decreasing the length of time she can stand. (A.R. 27, 308). As a result, Plaintiff reported an inability to do laundry on her own, drive longer than ten miles or at night, care for her grandmother, shop by herself, bathe on a daily basis and can only cook using the microwave or oven. (A.R. 27, 308). At the hearing, Plaintiff testified that she spends a lot of time on the couch, could cook food in the microwave or oven, but could not stand at a stove, did not bathe unless necessary because standing in the shower is too painful and she cannot sit in the tub, and that she generally did not perform household chores, but washes dishes when there are no clean ones. (A.R. 27).

At the hearing, the ALJ observed that Plaintiff exhibited discomfort and asked to stand on several occasions. (*Id.*). W. Davis, the field office employee who helped Plaintiff complete her initial disability report, noted that Plaintiff squirmed in her seat and complained of pain after the interview. (A.R. 31, 253).

### b. 2011-2014 Medical Record

The ALJ recognized that the medical record supports a finding that

Plaintiff's obesity and degenerative disc disease give rise to significant symptoms requiring strong medication and frequent treatment from January of 2011 to June of 2014. (A.R. 28).

On January 7, 2011, Mark Alan Harris, M.D. found that Plaintiff was suffering from chronic axial lower back pain with a strong central sensitization component. (A.R. 28, 628). In May of 2011, Patrick Charles Watson, D.O. saw Plaintiff for a pain consultation. Plaintiff indicated that her pain was worst in her lower back, but had pain in other areas as well. (A.R. 28, 648). Dr. Watson observed that the medication Plaintiff was taking, an oral opioid Norco 10/325mg and ibuprofen 1600mf, was only mildly effective and gave Plaintiff only little improvement with quality of life and function. (A.R. 28, 648). Nonetheless, Dr. Watson observed that Plaintiff continued to live a semi-active lifestyle. (A.R. 28, 651). Dr. Watson also advised Plaintiff that she should be evaluated for a comprehensive pain management program because she had been over-relying on her opioid medication. (A.R. 28, 649).

Throughout 2011, several doctors noted Plaintiff's over-reliance on opioids. Dr. Chung found that Plaintiff used 30 days of Norco in 17 days and Kay Tuo Huber, M.D., found that Plaintiff had been taking 4 or 5 tabs per day, instead of her usual 3 tabs per day. (A.R. 29, 531, 529). In October of 2011, Dr. Huber reported that Plaintiff had been taking 8 tabs per day prior to deescalating to just 2 tabs per day. (A.R. 29, 739). The ALJ noted that "this overreliance seems to have ended, and the record subsequently shows a more dedicated effort on the part of [Plaintiff] to pursue alternatives to pain medication." (A.R. 29).

Plaintiff underwent an initial pain psychologist assessment with Soyeon Karen Chung, Ph.D. in May of 2011. (A.R. 28). Dr. Chung found that

Plaintiff was fairly to poorly coping with her chronic pain and indicated that Plaintiff's depression impaired her ability to engage in adaptive coping. (A.R. 28-29, 549). In mid-August, Plaintiff told Dr. Harris that she tried to return to work, but was unable to tolerate sitting, standing or walking for a prolonged time. (A.R. 29, 680). On September 18, 2011, Plaintiff saw William Anthony Bourque, N.P. in the emergency room, Plaintiff complained of acute pain to the slightest light touch on the lower para lumbar region bilaterally. (A.R. 29, 531). Mr. Borque noted that Plaintiff could only complete a bilateral straight leg raising test to 20 degrees due to pain. (A.R. 29, 531). In October of 2011, Dr. Harris noted that Plaintiff exhibited pain during his palpation and range of motion tests. (A.R. 29, 680). In December of 2011, Plaintiff reported suffering from constant back pain and leg weakness and indicated that acupuncture and acupressure did not help. (A.R. 29, 457, 465).

In January of 2012, Dr. Huber observed that Plaintiff was experiencing significant side effects from tapering off of Norco. (A.R. 29, 739-40). An MRI of Plaintiff's lumbar spine from January of 2012 showed degenerative disc disease at L4-5 and showed no significant changes since Plaintiff's January 2010 MRI. (A.R. 29, 388-89, 427). Plaintiff's physical condition began to improve in February 2012. (A.R. 29). Plaintiff told Dr. Huber she could walk and stand and wanted to go back to full time work. (A.R. 29, 788). In March of 2012, Plaintiff indicated she had gone back to work, but was unable to bend or lift due to back pain. (A.R. 29-30, 788). In April of 2012, Plaintiff saw Dr. Watson and complained of achy, sharp, and burning pain. (A.R. 30, 803).

In July of 2012, Plaintiff reported that she was hospitalized for mental symptoms caused by her medications and was experiencing chronic fatigue,

rendering her unable to work.  (A.R. 30, 380, 858).  Dr. Huber told Plaintiff that losing weight would cure her problem and she should keep active and exercise.  (A.R. 30, 859).  In August of 2012, Plaintiff reported that time off from work helped her both physically and mentally, that she had been exercising regularly in the pool and that she had not used Norco in over two weeks.  (A.R. 30, 1096).  In November of 2012, Plaintiff reported worsening pain when she tried to return to work and that she was hospitalized twice for back pain in November and December and once for flank pain suspected to arise from musculoskeletal causes.  (A.R. 30, 1055, 1066, 1088, 1094).

In March of 2013, Plaintiff told Dr. Pack that her symptoms were fairly stable on her current medications but worsened with increased activity. (A.R. 30, 1053).  In March of 2014, Plaintiff stated that her pain was "good now" and in June of 2014 she reported making an effort to lose weight and that her pain was mostly better.  (A.R. 30, 1053, 1166, 1171).

### c.     Lay Opinions

In Robert Powers, Jr.'s (Plaintiff's boyfriend) August 14, 2012, third party function report, he reported that Plaintiff's impairments limited her ability to lift, walk, squat, sit, bend, kneel, stand, climb stairs and complete tasks.  (A.R. 31, 280).  Additionally, Mr. Powers stated that Plaintiff could not kneel, could only climb two flights of stairs at most, and that her ability to complete tasks is dependent on her current pain level.  (A.R. 31, 282).  He reported that Plaintiff sometimes slept sitting up and got up in the middle of the night.  (A.R. 31, 276).  The ALJ gave only partial weight to Mr. Powers because he did not know Plaintiff prior to the alleged onset of her impairments.  (A.R. 31).  The ALJ explained that this indicates that Mr. Powers has less than a thorough, longitudinal view of her condition.

Teresa Michelle Browning, a longtime friend of Plaintiff, indicated in

16cv928-AJB-MDD

her July 2014 letter that before the onset of Plaintiff's impairments, Plaintiff was hardworking, energetic, social, always happy, very strong physically and never complained about ailments. (A.R. 31, 1114). After the onset of her impairments, Ms. Browning stated that Plaintiff was depressed, physically weak, lethargic and constantly in pain. (A.R. 31, 1114). Additionally, Ms. Browning reported that Plaintiff spent less time socializing and did not seem able to walk, sit, or stand for lengthy periods of time. (A.R. 31, 1114). Ms. Browning opined that Plaintiff's attempts to work caused her health to decline. (A.R. 31, 1114). The ALJ gave partial weight to Ms. Browning's opinion because she did not regularly see Plaintiff between 2010 and 2013 and the record contradicts some of her opinion. (A.R. 31). For example, Ms. Browning opined that Plaintiff's medication was not helping her when the record and Plaintiff contradict that statement. (*Id.*).

### d. Dr. Lorber

The ALJ gave some weight to Arthur Lorber, M.D., the testifying medical expert. (A.R. 31). Dr. Lorber testified that Plaintiff could occasionally lift 20 pounds; frequently lift 10 pounds, occasionally crouch, stoop, or kneel; could never crawl, climb ladders, scaffolds, or ropes, or work at unprotected heights or in environments with high vibrations; could occasionally work around moving machinery, ascend and descend ramps and operate foot pedals; could stand and walk for two hours in an eight hour workday for thirty minutes at a time; sit for six hours in a day for thirty minutes at a time; and at the end of thirty minutes of sitting could stand or walk for thirty minutes. (A.R. 31-32). The ALJ found that the record does not support Dr. Lorber's opinion that Plaintiff can lift at the light exertional capacity, sit for only thirty minutes at a time, or that she requires as specific a sit/stand option as suggested. (A.R. 32). Additionally, the ALJ found that

the record does not suggest that Plaintiff can work around moving machinery. (*Id.*).

### e. Dr. Close

Dr. Frederick W. Close, the State's orthopedic consultative examiner, examined Plaintiff on October 12, 2012 and noted that Plaintiff exhibited increased lumbar lordosis, stood and walked with a normal gait and exhibited normal heel and toe walking. (A.R. 30, 1010). A cervical spine examination revealed no tenderness on palpation and no spasm, but the dorsolumbar spine examination revealed tenderness in the right lumbar spine with some spasm. (A.R. 30, 1010-11). Dr. Close found Plaintiff's hip flexion limited due to her obesity, but otherwise normal and her straight leg raising and shoulder impingement tests normal. (A.R. 30, 1011). Dr. Close also found Plaintiff's left elbow was extremely tender and that Plaintiff started crying when he attempted to check a biceps reflex on the left elbow. (A.R. 30, 1011). He also noted that Plaintiff did not exhibit enough trigger points to qualify for an actual diagnosis of fibromyalgia and diagnosed her with polymyalgia. (A.R. 30, 1011). Dr. Close opined that Plaintiff could sit, stand and walk for at least six hours in an eight hour work day with normal rest breaks, lift and carry fifty pounds occasionally and twenty-five pounds frequently and had no other limitations. (A.R. 32). The ALJ gave little weight to Dr. Close because the record suggests that Plaintiff's functional capacity is subject to "far greater limitations." (*Id.*).

### 2. Plaintiff's Mental Impairments

In considering Plaintiff's underlying medically determinable mental impairments, the ALJ specifically referred to: (a) the medical record from 2011 until 2014; (b) State psychiatric consultative examiner Gregory M. Nicholson, M.D.'s opinion; (c) Plaintiff's statements; and (d) Mr. Cannon's

statements.

### a. 2011-2014 Medical Record

Plaintiff was suffering from serious mental health symptoms when she was hospitalized for suicidal ideation between February 23, 2011 and February 26, 2011. (A.R. 32-33, 350). Her global assessment of functioning (GAF) score was between 35 and 40, which indicated either some impairment in reality testing or communication, or major impairment in several areas, such as work, school, family relations, judgment, thinking or mood. (A.R. 32, 1116). Plaintiff told a mental care provider she had not actually had suicidal ideation prior to hospitalization. (A.R. 32, 1195). Rather, Plaintiff explained that her roommates misinterpreted a comment she made about her inability to fall asleep and "caused" Plaintiff to be hospitalized. (A.R. 32, 1195). While Plaintiff stated she had not been medicated for mental issues prior to her hospitalization, the record indicates that Plaintiff abruptly stopped taking Cymbalta, a mental health medication, shortly before hospitalization. (A.R. 32, 350).

In March of 2011, Plaintiff reported that she was taking Prozac and trazodone for her mental impairments, which she was still taking as of July of 2014. (A.R. 33, 637, 1176). The ALJ noted that the consistency in medication indicates its success in stabilizing Plaintiff's mental impairments and that Plaintiff has rarely sought treatment for mental issues unrelated to her pain management regimen. (A.R. 33, 450, 465, 547).

In March of 2012, after Plaintiff temporarily returned to work, she complained to Dr. Huber that she was under a lot of stress, was suffering from anxiety and insomnia and that she had a two-hour panic attack at work. (A.R. 34, 404).

Lisa Ho, Psy.D., Plaintiff's treating psychologist, reported that in March

15

of 2014, Plaintiff suffered from mild depression. (A.R. 33, 1217). In May of 2014, Plaintiff told Dr. Ho that things were "fabulous" with her friends, boyfriend, car, sleep, etc., that she is on an "even keel" and didn't feel she needed therapy. (A.R. 33, 1204). In June of 2014, Plaintiff indicated that her mood was tied to her physical impairments and described her depression as "situational." (A.R. 33, 1166, 1175).

### b.    Dr. Nicholson

On October 9, 2012, Plaintiff told Gregory M. Nicholson, M.D., the State's psychiatric consultative examiner that she had visual hallucinations that looked like sparkling lights or movement out of the corner of her eye, that she suffered from insomnia, fluctuating appetite, decreased energy, had trouble concentrating and had a decreased interest in normal activities, but denied experiencing suicidal ideation or symptoms of anxiety disorders or mania. (A.R. 33, 1001). Dr. Nicholson noted that Plaintiff's appearance, attitude and behavior were favorable and that she was coherent and organized without tangential or loose associations. (A.R. 33, 1002). He indicated that Plaintiff's speech was normally and clearly articulated, that she was alert and oriented to time, place, person and purpose and that she appeared to be of average intelligence. (A.R. 33, 1003). Dr. Nicholson did find that Plaintiff's mood was depressed and that her affect was tearful and dysphoric. (A.R. 33, 1003). He diagnosed Plaintiff with psychotic and depressive disorders (not otherwise specified), and assigned her a GAF of 55, which indicates either moderate symptoms or moderate difficulty in social, occupational, or school functioning. (A.R. 33, 1004). Dr. Nicholson expected Plaintiff's condition to improve in the next year with active treatment. (A.R. 33, 1004). At the hearing, Plaintiff said that she still experienced hallucinations, but that she knew they were not real. (A.R. 33).

The ALJ gave partial weight to Dr. Nicholson's opinion. (A.R. 34). Dr. Nicholson opined that Plaintiff is able to understand, remember and carry out simple one or two-step job instructions and do detailed and complex instructions. (A.R. 34, 1004). He found Plaintiff was mildly limited in her ability to relate and interact with coworkers and the public and mildly limited in her ability to maintain concentration and attention, persistence and pace. (A.R. 34, 1004). Additionally, he found that Plaintiff was mildly limited in her ability to perform work activities without special or additional supervision, but also found no limitation in her ability to accept instructions from supervisors and to maintain regular attendance and perform work activities consistently. (A.R. 34, 1004-05). The ALJ found that the record indicates that Plaintiff's anxiety significantly increases when she is at work, which limits her to unskilled work involving simple instructions, but does not support a finding of mild limitation in interacting with coworkers, supervisors, or the public, or that she would be unable to maintain regular attendance or perform work activities consistently. (A.R. 34).

### c.   Dr. Rovno and Dr. Martin

David Rovno, M.D., and Judy K. Martin, M.D., the State's psychiatric consultants who reviewed Plaintiff's record opined that Plaintiff's mental impairments gave rise to mild restriction in her activities of daily living, in her ability to maintain social functioning, concentration, persistence, or pace, and no repeated episodes of decompensation. (A.R. 25, 99, 108, 289, 298). The ALJ gave their opinions partial weight because the record suggests that Plaintiff's mental impairments give rise to more significant difficulties in her concentration, persistence and pace. (A.R. 25).

### d.   Plaintiff's Statements

Plaintiff's August 13, 2012, function report alleged that her

impairments limited her memory and ability to concentrate and that she could pay attention between one and two hours, but was easily distracted and that her medication drastically affected her short-term memory. (A.R. 26-27, 288, 290). Her medication also caused her to forget words and spelling, and she required frequent reminders of spoken instructions. (A.R. 27, 288, 290).

At the hearing, Plaintiff testified that she still sometimes experienced panic attacks, becomes manic and sobs uncontrollably. (A.R. 27). She testified that she takes Prozac and trazadone, that she saw a psychologist about five times since March of 2014 and planned to start psychiatric treatment again. (*Id.*).

## C. Issues on Appeal

### 1. Lay Witness Testimony/Third Party Function Reports

Plaintiff argues the ALJ erred in granting little to no weight to the statements of Robert Powers (Plaintiff's boyfriend) and Teresa Michelle Browning (Plaintiff's longtime friend). Plaintiff states the ALJ may consider evidence from non-medical sources, such as relatives, to show the severity of the claimant's impairment and how it affects her ability to work. See 20 C.F.R. § 404.1513(d). In this case, Mr. Powers (A.R. 273-281) and Ms. Browning (A.R. 1114) individually prepared and submitted statements regarding Plaintiff's physical/mental disability.

Defendant cites *Valentine v. Commissioner*, *Soc. Sec. Admin.*, 574 F. 3d 685, 694 (9th Cir. 2009) for the proposition that "the Ninth Circuit has held that an ALJ can properly discredit lay witness testimony by noting that the lay witnesses had either insufficient contact with Plaintiff, or insufficient knowledge of Plaintiff's functioning, during the relevant adjudicatory period." Defendant asserts Mr. Powers' and Ms. Browning's statements are not supported by the credited medical evidence." (D. ECF 17 at pg.15).

"Lay testimony is not equivalent to medically acceptable diagnostic techniques that are ordinarily relied upon to establish disability." *Vincent on Behalf of Vincent v. Heckler,* 739 F.2d 1393, 1395 (9th Cir.1984). However, lay witness testimony as to a claimant's symptoms is competent evidence which the Commissioner must take into account. *Dodrill,* 12 F.3d at 919. Such testimony is competent evidence and cannot be disregarded without comment. *Van Nguyen v. Chater,* 100 F.3d 1462, 1467 (9th Cir.1996). More recently, in *Stout v. Commissioner*, 454 F.3d 1050, 1053 (9th Cir. 2006), the Ninth Circuit confirmed that "'lay testimony as to . . . how an impairment affects ability to work is competent evidence . . . and therefore cannot be disregarded without comment.'" (internal citations omitted). Further, "[n]umerous regulations command the ALJ to consider throughout the sequential process, lay testimony as to how claimants' impairments affect their ability to work. *See e.g.*, 20 C.F.R. §§ 404.1513(d)(4) & (e), 404.1529(c), 404.1545, 416.913(d)(4) & (e), 416.929(c), 416.945." *Stout v. Commissioner*, 454 F.3d 1050, 1056 (9th Cir. 2006).

Robert Powers' Third Party Function Report[2] confirms that the ALJ's reasons for discounting Mr. Powers' opinion are specifically germane to Mr. Powers. For example, the ALJ states that she gave partial weight to his opinion because contained in his report are specific limitations that appear credible coming from someone who lives with the Plaintiff. (A.R. 31). For example, Mr. Powers reported that she can "lift less than 5 pounds, no squatting or bending, can stand only 15 minutes, walk for 15 minutes, sit one hour." (A.R. 279). The ALJ pointed out, however, that by his own admission

_____

[2] This is a form offered by the Social Security Administration to allow lay persons to share their perceptions and opinions regarding a claimant's disability. (Form SSA-3380-BK).

Mr. Powers does not see Plaintiff for much of the day (when he is at work) nor did he know Plaintiff prior to the onset of her alleged disability which "indicates he has less than a thorough, longitudinal view of her condition." (A.R. 31). Notably, Mr. Powers' report also contains statements contradictory to Plaintiff's own statements. Specifically, Plaintiff stated in her own function report that she must be frequently reminded when given spoken instructions. (A.R. 288). Yet Mr. Powers stated in his report that she follows spoken instructions "very well." (A.R. 279). Additionally, Mr. Powers answered "I don't know" to eight of the questions related to what she did before she was ill and/or what she did during the day when he was at work. (A.R. 279-281).

Thus, contrary to Plaintiff's assertions, the ALJ did not reject Mr. Brown's lay testimony without comment or findings. "It is the ALJ's role to resolve evidentiary conflicts. If there is more than one rational interpretation of the evidence, the ALJ's conclusion must be upheld." *Allen v. Sec'y of Health and Human Servs.*, 726 F.2d 1470, 1473 (9th Cir. 1984). The record demonstrates the ALJ considered and properly gave only partial weight to Mr. Powers' Third-Party Adult Function Report.

After considering the letter from Plaintiff's longtime friend, Teresa Michelle Browning, the ALJ also gave Ms. Browning's opinion only partial weight. Ms. Browing's letter was comprised of a single paragraph. In it, Ms. Browning stated, in part:

> **I was not here to see her fall ill but I believe her illness changed her dramatically. . . .[i]n 2013 [she] was not the same woman, she was depressed, physically weak, incredibly lethargic and in constant pain. . . . So far I have not noticed medications helping her in any way . . . [f]rom my point of view her issues of work and health compound one another. . . . I truly hope she can become well someday**

16cv928-AJB-MDD

**but in her current state it is my firm belief that she needs assistance to gain some semblance of a normal life.**
(A.R. 1114).

In her decision, the ALJ noted that she gave partial weight to Ms. Browning's letter "in light of her long relationship with [Plaintiff]." (A.R. 31) The ALJ noted, however, that Ms. Browning had not seen Plaintiff from 2010 to 2013, "a period which encompasses the alleged onset date, and much of the medical record." (*Id.*). The ALJ also noted that Ms. Browning's opinion about Plaintiff's medication not helping her, contradicts the medical record. Consequently, the ALJ only gave partial weight to Ms. Browning's letter based on her limited interaction with Plaintiff for several years. A person must have sufficient contact with a claimant during the relevant time period in order to qualify as a competent lay witness. *Crane v. Shalala*, 76 F.3d 251, 254 (9th Cir. 1995). *Cf. Sprague v. Bowen*, 812 F2d 1226, 1232 (9th Cir. 1987) ("Descriptions by friends and family members in a position to observe a claimant's symptoms and daily activities have routinely been treated s competent evidence.").

Here, the ALJ satisfied her burden by providing germane and concise reasons for not fully crediting the lay opinions of Mr. Powers or Ms. Browning. Accordingly, the Court finds that the ALJ's consideration of the lay witness testimony is free of legal error and recommends Plaintiff's claim on this issue be DENIED.

### 2. Plaintiff's Obesity

Plaintiff argues the ALJ failed to consider the impact of her obesity combined with her other multiple impairments on her ability to work. Specifically, Plaintiff argues that an ALJ has a responsibility to determine the effect her obesity has on her other impairments and ultimate RFC

assessment. (P. ECF 15 at pg.10). Plaintiff asserts that the ALJ failed to include a sit/stand option[3] and made no mention of the effect of her obesity on her severe lumbar spine impairment and related back pain. (P. ECF 15 at pg. 12). According to Plaintiff, "the ALJ simply chose to ignore many of Plaintiff's most significant limitations." (P. ECF 15 at pg. 11).

Plaintiff relies on Dr. Lorber's report that Plaintiff can do no more than sedentary work with standing and walking limited to two hours per day. (P at pg. 12). Plaintiff contends that the findings of Dr. Lorber are consistent with Plaintiff's testimony and Third Party Reports. (*Id.*). Plaintiff also argues that even though the ALJ utilized the assistance of the VE, the ALJ erred by failing to include a sit/stand option in the available jobs within Plaintiff's RFC. (P. ECF 15 at pg. 13).

Defendant states "the ALJ properly determined that the objective medical evidence . . . did not support the inclusion of additional limitations in the RFC." (Def. ECF 18 at pg. 9). Defendant also asserts that "obesity must be evaluated based on the information in the case record." (*Id.*). "In particular, as the ALJ noted, Plaintiff consistently had normal (and unassisted) gait, range of motion, coordination, strength, sensation, reflexes, and straight leg raise testing during physical examinations." (*Id.* citing A.R. at 29-30, 350, 361, 370, 380, 430, 443, 479, 485, 491, 498, 522, 543, 1053, 1064, 1068, 1071, 1080, 1089,1092-93, 1096, 1182, 1224, 1228).

In this case, the ALJ determined that Plaintiff satisfied the criteria for steps one, two and four – she has not engaged in substantial gainful activity, she suffers from "severe" impairments (but not a listed impairment) and she

---

[3] Such a limitation is commonly referred to as an at-will sit/stand option. *Wester v. Colvin*, 2015 WL 4608139 (C.D. Cal. July 31, 2015).

16cv928-AJB-MDD

is not capable of performing her past work. Specifically, the ALJ noted that "[t]he claimant has the following severe impairments: degenerative disc disease, obesity, psychotic disorder, and depressive disorder." (A.R. 23). The ALJ goes on to state that "the medical record suggests the claimant is obese." (*Id.*). "Because of obesity, an individual may have limitations in any of the exertional or postural functions, in her ability to manipulate objects, and in her tolerance of extreme heat, humidity, or hazards. . . . The effects of claimant's obesity have been considered when determining a residual functional capacity for the claimant." (*Id.*).

In analyzing the effect of Plaintiff's obesity on her other impairments and overall functional capabilities the ALJ found:

> **In cases where obesity is a severe impairment, it may be found to equal a listing, or alternatively, may increase the severity of coexisting or related impairments to the extent that the combination of impairments to the extent that the combination of impairments meets the requirements of a listing. Here, the effects of the claimant's obesity are not sufficiently severe to equal a listing, and do not increase the severity of a coexisting or related impairment sufficiently to meet the requirements of a listing.**

(A.R. 24).

Ultimately, the ALJ assessed Plaintiff's RFC as follows:

> **[C]laimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can lift, carry, push or pull no more than 10 pounds, stand or walk no more than 2 hours, total, in an 8-hour workday, and for nor more than 30 minutes at a time, sit for 6 hours in an 8-hour workday, with the ability to stand and stretch not more than 10 percent of the day; occasionally climb ramps and stairs, balance, stoop, kneel, and crouch, never climb ladders, ropes, or scaffolds, crawl, operate fast or dangerous**

**machinery or drive commercial vehicles; never work in environments involving exposure to unprotected heights, or concentrated exposure to vibration; can perform no more than unskilled work, involving simple, repetitive tasks, and cannot perform fast paced work.**

(A.R. 26).

The medical evidence in the record supports the ALJ's assessment. For example, Plaintiff's treating physician, Dr. Harris, noted that in October 2011, Plaintiff presented with pain during his palpitation and range of motion tests, but she could heel walk, toe walk, and perform a deep knee bend. (A.R. 679). In January 2012, Dr. Huber reported that Plaintiff displayed normal reflexes, muscle tone, and coordination. (A.R. 739). Similarly, Plaintiff demonstrated normal muscle strength, normal deep tendon reflexes bilaterally in her knees and normal gait. (*Id.*). In February 2012, during a follow-up office visit for back pain, Dr. Huber noted Plaintiff to be morbidly obese and instructed her on, among other things, BMI/weight management and smoking cessation. In addition, Plaintiff was directed to continue on her current pain medication regimen. (A.R. 787). During a subsequent office visit in July 2012, Dr. Huber, discussed Plaintiff's obesity and encouraged diet and exercise. He also noted Plaintiff was still smoking. These visits demonstrate the rather non-critical manner in which Dr. Huber treated Plaintiff's obesity.

Dr. Rachel Tabangcura Pack, D.O., a treating physician, reviewed Plaintiff's June 2012 MRI and found, in part, degenerative disc disease at L4-5 with the remainder of the visualized lumber intervertebral disk spaces essentially preserved. Significantly, Dr. Pack noted that Plaintiff's current MRI showed no notable changes when compared to a January 2010 MRI. (A.R. 388).

The ALJ also cited to the findings of Dr. Frederick Close, M.D., the State's orthopedic consultative examiner. During an examination in October 2012, Dr. Close noted that Plaintiff showed increased lumbar lordosis, however, her cervical spine examination revealed no tenderness on palpitation and no spasm. Dr. Close reported Plaintiff had normal range of motion in her cervical spine, hips, knees, ankles, shoulders, elbows, wrists, and fingers. (A.R. 1009-1011). Plaintiff demonstrated some limitation in range of motion in the dorsolumber spine and examination of the dorsolumber spine revealed tenderness in the right lumbar spine with some spasm. (*Id.*). Dr. Close's functional assessment included the following: "The examinee should be able to sit, stand and walk at least six hours out of an eight hour day with normal rest breaks. She did not require assistive devices and could lift and carry 50 pounds occasionally, 25 pounds frequently. Plaintiff has no postural, manipulative, or visual limitations." (*Id.*). Notably, the ALJ gave little weight to the opinion of Dr. Close, because as noted previously he opined that Plaintiff could sit, stand, walk at least 6 hours in an 8 hour day with normal rest breaks; and was capable of lifting and carrying 50 pounds occasionally and 25 pounds frequently with no other limitations. (A.R. 1011). The ALJ found that "Dr. Close's opinion is inconsistent with the record, which . . . suggests that the claimant's functional capacity is subject to far greater limitations." (A.R. 32). Likewise, Dr. Lorber's opinion was given only some weight because he opined that Plaintiff could lift at the light exertional capacity and occasionally work around moving machinery, but could sit only for 30 minutes at a time and requires a sit/stand option. (A.R. 32).

Despite Plaintiff's claims that the ALJ failed to consider Plaintiff's obesity and how it affects her other limitations, it is clear from a review of the

ALJ's decision and citation to the medical record that the ALJ's RFC determination was based on substantial evidence. Throughout her decision the ALJ addressed and considered the impact of Plaintiff's obesity in regard to alleged disabilities. Indeed, the ALJ appeared to have sensitively addressed the impact of Plaintiff's weight on her RFC. For example, the ALJ stated she determined Plaintiff's sitting restrictions based, in part, upon Plaintiff's behavior at the hearing. The ALJ noted that during the hearing Plaintiff exhibited discomfort and stood to stretch on several occasions. (*Id.*). Likewise, the ALJ relied upon the statement of a field office employee who noted that Plaintiff was uncomfortable sitting and complained of pain following the interview. (A.R. 31).

The ALJ also considered and addressed a letter brief submitted by Plaintiff's representative, Mr. Roy Cannon. Significantly, Mr. Cannon argued that Dr. Lorber's testimony was limited to reviewing Exhibits 1F-13F and did not have the benefit of claimant's testimony, or Exhibits 14F-17F. (A.R. 330). Yet, in Plaintiff's motion for summary judgment prepared by Mr. Cannon, Plaintiff argues that the ALJ committed reversible error for not following Dr. Lorber's opinion testimony. (P. ECF 15 at pg. 12). In response, to Mr. Cannon's letter brief, the ALJ stated that "while the record supports many of the statements contained in Mr. Cannon's [] brief, his conclusions are not supported." (*Id.*). For example, the ALJ points out that the record does not support Mr. Cannon's contention that Plaintiff is unable to complete an 8 hour work day, would likely miss one or more days per week of work due to her impairments, and is limited to sitting and standing 5 to 10 minutes at a time. (*Id.*).

Title 20 C.F.R. § 416.920(b) states "after the [ALJ] review[s] all of the evidence relevant to your claim, including medical opinions [the ALJ] make[s]

findings about what the evidence shows." *Id.* Indeed, it is well settled that "the ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence." *Tommasetti*, 533 F.3d at 1041-42. Even when the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion. *Andrews v. Shalala,* 53 F.3d 1035, 1041 (9th Cir.1995); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). Here, the ALJ clearly relied on the findings of the treatment records and reports cited in the administrative record. The ALJ's findings are consistent with the record as a whole.

Plaintiff next contends the ALJ "failed to instruct the vocational expert to consider the claimant's need to alternate between periods of sitting and standing. (P. ECF 15 at pg. 13). In response, Defendant cites to *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001), for the proposition that "[b]ecause the ALJ included all of the limitations [] found to exist, and because [her] findings were supported by substantial evidence the ALJ did not err in omitting the other limitations that [Plaintiff] had claimed, but had failed to prove." *Id.*

In support, Plaintiff makes three arguments to support her claim. First, Plaintiff states "Dr. Lorber found that plaintiff is essentially limited to sedentary work. . . [s]itting could be accomplished for a total of 6 hours a day, but not … more than 30 minutes at a time. . .[a]fter sitting for 30 minutes, plaintiff should rise and continue to work in a standing or walking position for a period of thirty minutes." (P. ECF 15 at pg. 12 citing A.R. 49-58). Plaintiff goes on to assert that "[t]he limitations found by Dr. Lorber are consistent with the testimony of plaintiff. . . ." (*Id.*).

Plaintiff's reliance on Dr. Lorber's opinion is error. As noted herein, Plaintiff's RFC does not incorporate a sit/stand option, rather a stand and

stretch option. Also, an ALJ is not required to fully adopt or even give "great weight" to the opinion of one physician, rather, an ALJ is required to consider "all of the relevant medical and other evidence" when establishing an RFC. *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)

Second, Plaintiff argues that the ALJ "failed to instruct the vocational expert to consider the claimant's need to alternate between periods of sitting and standing." (P. ECF 15 at pg. 13). Plaintiff's argument is not supported by the facts and evidence presented. For example, the ALJ included in Plaintiff's RFC the need to stand and stretch not the need for alternating at will between sitting and standing while continuing to work (i.e. sit/stand option). A review of the hearing transcript demonstrates that when the VE was called to testify, the ALJ presented the VE with the following hypothetical:

> **ALJ: I would like you to consider someone the same age, education, and past work experience as [Plaintiff], with the following limits specifically: Lifting and carrying no more than 20 pounds occasionally, 10 pounds frequently; pushing and pulling within those weight limits; standing and walking would be limited to two hours out of an eight-hour workday, with no prolonged walking greater than 30 minutes at a time, sitting six out of eight with the ability to stand and stretch, not to exceed 10 percent of the day; no ladders, ropes, and scaffolds; no crawling,; occasional as to all the postural; no work hazards such as working at unprotected heights, operating fast or dangerous machinery or driving commercial vehicles; no concentrated exposure to vibration; unskilled work; simple repetitive tasks; no fast paced work.**

(A.R. 83).

In response, the VE testified that Plaintiff would be unable to perform any of her past work, but after the ALJ modified the hypothetical to lifting no more than 10 pounds, either occasionally or frequently and limited Plaintiff

16cv928-AJB-MDD

to sedentary work, the VE testified that there were other jobs in the national economy that Plaintiff could perform at the sedentary and unskilled level. (A.R. 84). According to the Dictionary of Occupational Titles, sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs may be categorized as Sedentary when walking and standing are required only occasionally and all other sedentary criteria are met. *Appendix C. Physical Demands, SCODICOT Appendix C.*

Here, the VE testified that Plaintiff would be able to perform the jobs of information clerk 237.367-018, mail clerk 209.687-026, or charge account clerk 205.367-014. A review of these job descriptions as set out by the Dictionary of Occupational Titles demonstrate that the position of information clerk is categorized as light work with no significant handling, a medium degree of finger dexterity, low degree of manual dexterity, and markedly low eye-hand-foot dexterity. *Dictionary of Occupational Titles, Fourth Ed. Revised 1991.* The position of mail clerk is categorized as light work, with significant handling, with a low degree of aptitude ability in finger dexterity, manual dexterity and eye-hand-foot dexterity. [4] *Id.* The third job cited by the VE was charge account clerk and is sedentary work with no significant handling of things and with a low degree of aptitude ability in finger dexterity, manual dexterity and eye-hand-foot dexterity. *Id.*

Lastly, Plaintiff cites to the VE's testimony in response to questioning by Plaintiff's representative to support her claim. Specifically, Mr. Cannon asked the VE "those jobs don't have a sit/stand option do they?" The VE

---

[4] While the DOT categorizes two of these jobs as light, the VE testified that for the mail clerk position "the Department of Labor and the Bureau of Labor Statistics also has this position at sedentary." (A.R. 84).

replied "no." Mr. Cannon went on to ask "So if a sit/stand option was required, those jobs would not be available, correct?" The VE replied "That's correct." (A.R. 86). This testimony does not help Plaintiff's allegation of error because as noted above the sit/stand option was not included in Plaintiff's RFC, so it is irrelevant whether those jobs are not available to someone who requires a sit/stand option.

The RFC developed by the ALJ is better suited to Plaintiff's limitations. In fact, Plaintiff testified that she is only able to stand for 5-10 minutes:

> **ALJ:** **How long are you able to stand, on average?**
> **Plaintiff:** **Five to 10 minutes.**
> **ALJ** **Then what happens?**
> **Plaintiff:** **Then I get the burning sensation through my legs. . .my legs go numb.**

(A.R. 78).

Based upon the record evidence, a sit/stand option is no option for Plaintiff, rather, her RFC contemplates that if she is in a sedentary job, she will be able to stand and stretch and sit back down after 5-10 minutes. Including a sit/stand option in Plaintiff's RFC would have been error.

Title 20 C.F.R. § 416.927(6)(d)(1) states in part, "[the ALJ is] responsible for making the determination or decision about whether [a claimant] meet[s] the statutory definition of disability." The Court's review of the administrative record revealed no ambiguity or error indicating that the ALJ's decision was based on less than substantial evidence. 42 U.S.C. § 405(g). The opinion evidence in the record supports the ALJ's decision with few exceptions.

Accordingly, the Court finds the ALJ's findings of fact and conclusions of law, including Plaintiff's RFC, is supported by substantial evidence and free of legal error.

# III.  CONCLUSION

The Court **RECOMMENDS** that Plaintiff's Motion be **DENIED** and that Defendant's Motion be **GRANTED**.  This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).

**IT IS HEREBY ORDERED** that any written objection to this report must be filed with the court and served on all parties no later than May 10, 2017.  The document should be captioned "Objections to Report and Recommendations."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than May 17, 2017. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

Dated:   April 25, 2017

Hon. Mitchell D. Dembin
United States Magistrate Judge

16cv928-AJB-MDD